**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-01150-WJM-MEH

CHADA MANTOOTH, et al., individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

BAVARIA INN RESTAURANT INC D/B/A SHOTGUN WILLIE'S, et al.,

      Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RENEWED MOTION TO COMPEL
INDIVIDUAL ARBITRATION AND DISMISS OR STAY PROCEEDINGS [Doc. 57]**

---

## I. INTRODUCTION

Defendants have exploited their superior bargaining strength and Plaintiffs' vulnerability to avoid paying them for their work by forcing Plaintiffs[1] to sign so-called "Entertainment License Agreements" ("Agreements") purporting to classify Plaintiffs as "licensees," rather than employees. In virtually identical cases here and throughout the country, almost "without exception,…courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage." *Clincy v. Galardi South Enterprises, Inc.* 808 F.Supp.2d 1326, 1343 (N.D. Ga. 2011). *See* Ex. 1, *Dancer Cases*. There can be no doubt that Defendants knew that based on their treatment of Plaintiffs, Plaintiffs legally had to be classified as employees under the Fair Labor Standards Act ("FLSA").[2] Nevertheless, Defendants maintain their illegal practices because their entire business model is predicated on willfully misclassifying dancers as independent contractors ("ICs") while treating them as employees. To effectuate this scheme, the "choice" Defendants provided Plaintiffs—working as a "licensee" or as an "employee"—was a choice in name alone. In reality, Defendants dissuaded Plaintiffs from choosing to be classified

---

[1] "Plaintiffs" refers to Named and Opt-in Plaintiffs, and putative class/collective action members.
[2] Shotgun Willie's managers knew this issue had been litigated before, and at least one admitted he knew that courts had ruled against clubs that misclassified dancers as independent contractors. *See* Poague Dep. 44:19-45:17, Ex. 2; Kohn Dep. 18:8-19:22, Ex. 3; Thornton Dep. 95:19-96:16, Ex. 4.

as employees and loaded the Agreements with provisions designed to prevent them from challenging their misclassification, including automatic breach of the Agreement (being fired) and having to pay Defendants' costs and fees if they lose. [Doc. 57], Ex. A-1, pp. 5, 7 ("Ex. A-1"). The Agreement thus constitutes a deliberate effort by Defendants to reap the benefits of illegally misclassifying Plaintiffs while preventing them from exercising their legal rights, rendering the Agreement's mandatory arbitration clause ("Arbitration Clause") invalid and unenforceable.

## II. LEGAL STANDARD

Arbitration under the Federal Arbitration Act ("FAA") is "simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). "Before the Act's heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014). The parties must have "an express agreement to arbitrate" that "was validly formed and...is legally enforceable." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010). An arbitration agreement is valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2012). This "saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud...or unconscionability." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Whether there is an enforceable contract to arbitrate is a matter of contract law to be decided by the court." *Hill v. Ricoh Ams. Corp.*, 603 F.3d 766, 777 (10th Cir. 2010). A court shall compel arbitration only "upon being satisfied that the making of the agreement for arbitration...is not in issue." 9 U.S.C. § 4 (2012); *see also id.* § 3. "The party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012).

Critically, "when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away." *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998). This Court thus must "view[] the facts most favorable to the party opposing arbitration." *Howard*, 748 F.3d at 977. Defendants cannot meet their burden to show the existence of a valid arbitration agreement because (1) the Arbitration Clause is unconscionable, and (2) the Clause's class/collective action waiver is illegal.

### III. THE ARBITRATION CLAUSE IS UNENFORCEABLE

### A.    This Court Must Determine the Arbitration Clause's Enforceability

Before compelling arbitration, "the Court is required to resolve any issues that go to the making of the agreement for arbitration." *Garcia v. Corinthian Colls., Inc.*, 2006 U.S. Dist. LEXIS 99047, at *8 (D. Colo. June 23, 2006); *see also Prima Paint*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967). Because Plaintiffs challenge the "making" of the "delegation" provision, *see* Ex. A-1 at 6, ¶22.A, this Court must decide the validity of the Clause. *See Rent-A-Ctr. W. Inc. v. Jackson*, 561 U.S. 63, 72 (2010). And, "to the extent that Plaintiffs argue that the delegation clause itself is unconscionable for the same reasons that the [Agreement] or arbitration provisions as a whole are unconscionable…, the Court [should] consider[] those arguments *as applied* to the delegation clause." *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 730 (E.D.N.Y. 2017).

As explained below, the manner in which Defendants presented the Agreements to Plaintiffs precluded Plaintiffs from validly assenting to any of the contract terms, *including* the Arbitration Clause and the delegation provision within it. *See* § III.B.1. The Supreme Court has not "merely preserve[d] for the courts challenges that are 'restricted' or 'limited' to 'just' the arbitration clause alone—this would be senseless; *it preserves for the courts any claim at all that necessarily calls an agreement to arbitrate into question.*" *See* Alan Scott Rau, *Everything You*

*Really Need to Know about "Separability" in Seventeen Simple Propositions*, 14 Am. Rev. Int'l Arb. 1, 17 (2003). For the same reason, this Court may not apply a presumption in favor of arbitrability. The Supreme Court has "applied the presumption favoring arbitration…only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed." *Granite Rock*, 561 U.S. at 302.When, like here, a party argues that the agreement was *not* validly formed, the party could not have "'clearly' and 'unmistakably' agreed to submit questions of arbitrability to the arbitrator" because "the gravamen of [the party's] claim is that [it] never consented to the terms in [the] agreement." *Rent-A-Center*, 561 U.S. at 81 (Stevens, J., dissenting). Thus, this Court may not assume that Plaintiffs agreed to arbitrate arbitrability, and, indeed it must "reverse[] the presumption" that applies when determining whether a particular merits-related dispute is arbitrable. *First Options*, 514 U.S. 938, at 944-45.

This case is analogous to *Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003), which held that a claim that a party lacked the mental capacity to enter into a contract necessarily encompassed a challenge to the contract's arbitration provision because such a claim "can logically be directed only at the entire contract," and was for the court to resolve. The Tenth Circuit did not limit its holding to challenges based on capacity. While it noted that "[c]ommentators have explained the distinction between challenging a contract on the basis of status (i.e., mental incapacity) and challenging a contract on the basis of the conduct [or behavior] of the bargaining party (i.e. fraudulent inducement)," *id.* at 1273 n.8, the cited commentator does not place procedural unconscionability in either category; rather, his description of the doctrine illustrates that it is a hybrid of both. *See* E. Allan Farnsworth, *Farnsworth on Contracts*, §§ 4.1, 4.28 (3d. ed. 2004). Procedural unconscionability challenges

entail examining *both* the behavior of the parties—"sharp bargaining practices"—and the status of the parties—their ability to understand the contract and their bargaining power. *Id.* Indeed, Plaintiffs' intoxication, which demonstrates procedural unconscionability, is a condition that "may…render a party unable to understand the nature and consequences of the transaction," and thus constitutes a challenge based on status. *Id.* at § 4.6. Therefore, Plaintiffs' argument that they lacked the ability to voluntarily enter into the Agreement, based in part on an inability to understand the nature and consequences of contracting, can logically be directed only at all the terms of the Agreement, including the Arbitration Clause and the delegation provision within the Arbitration Clause. *See Spahr*, 330 F.3d at 1273.

Plaintiffs' substantive unconscionability arguments are also specifically directed at the delegation clause. In *Rent-A-Center*, "none of [plaintiff's] substantive unconscionability challenges was specific to the delegation provision," which plaintiff never even mentioned. *Rent-A-Center*, 561 U.S. at 72-73 (2010). The Court explicitly observed that had the plaintiff's arguments challenging the contract's fee-splitting arrangement "challenged the delegation provision by arguing that [fee-splitting] *as applied* to the delegation provision rendered *that provision* unconscionable," it may be that "the challenge should have been considered by the court." *Id.* at 74. Here, as discussed more fully below, due to the Arbitration Clause's provisions requiring Plaintiffs to pay half the costs of arbitration and Defendants' costs and attorney fees if they lose a challenge to the validity of the arbitration clause, *See* Ex. A-1, 7, ¶ 22.E, Plaintiffs cannot afford the proceeding necessary for a determination whether the Arbitration Clause is valid and they are unlikely to risk doing so. *See* §§ III.B.2, C; *see also Dean v. Draughons Junior Coll.*, Inc., 2012 U.S. Dist. LEXIS 158294, at *60-61 (M.D. Tenn. Nov. 5, 2012); *Shankle v. B-G Maint. Mgmt. of Colo., Inc.*, 160 F.3d 1230, 1235 (10th Cir. 1999). When faced with very

similar challenges, courts have concluded that a party has specifically challenged the delegation clause: "[w]hile…allegedly prohibitive arbitration cost and…alleged bargaining power disparity may be equally applicable to all [contract] provisions," when "[the] [p]laintiff specifically argues those factors make the delegation provision itself unconscionable," the plaintiff has "specifically challenged the delegation provision as required in *Rent-A-Center*." *Johnson v. Wells Fargo Bank*, 2015 U.S. Dist. LEXIS 185016, at *5-6 (N.D. Ga. June 16, 2016); *see also Savaria v. Dynamex, Inc.*, 310 F.R.D. 412, 420, 422 (N.D. Cal. 2015).[3]

**B.      The Arbitration Clause is Unconscionable**

An agreement is unconscionable where, as here, there is "evidence of some overreaching on the part of one of the parties such as that which results from an inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to that party." *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986). Factors demonstrating unconscionability include "a standardized agreement executed by parties of unequal bargaining strength"; "lack of opportunity to read or become familiar with the document before signing it"; "the terms of the contract, including substantive unfairness"; and "the relationship of the parties, including factors of assent, unfair surprise and notice," *id.* — all factors present here.

**1.   Procedural Unconscionability Prevented Formation of a Valid Contract**

Defendants had a uniform policy and practice of presenting Plaintiffs with the

---

[3] Like *Rent-A-Center*, most of the cases Defendants cite are distinguishable. For instance, *Buckeye* addressed a challenge to the contract as a whole on the ground that the illegality of one of its provisions—but not the arbitration provision—"render[ed] the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). The Court held that such a challenge must be decided by the arbitrator because it did not challenge the arbitration provision specifically. *Id.* at 445-46. Similarly, *Alwert v. Cox Communs., Inc.*, 835 F.3d 1195, 1209 (10th Cir. 2016), relied on the nature of the plaintiff's "illusory promise" argument because "general contract law does not permit such an argument on a provision-by-provision basis." Moreover, "the argument [was] based on language outside [the arbitration] provisions." *Id.* at 1211. *See also Wiles v. Palm Springs* Grill, 2016 U.S. Dist. LEXIS 106297, at *7 n.2 (S.D. Fla. Aug. 10, 2016).

Agreements in a manner that precluded valid assent to the terms, including the Arbitration Clause, and thus the Clause is procedurally unconscionable and no valid arbitration agreement was ever formed.[4] The Agreements constituted "standardized[s] agreement[s] executed by parties of unequal bargaining strength," and Plaintiffs had no meaningful "opportunity to read or become familiar with the [Agreements] before signing" them. *Id.* It thus is irrelevant that Plaintiffs may not have read the Agreements, because a party is not bound by a contract if she can "demonstrate that…she was prevented from reading it or induced by the other party to refrain from reading it." *Hancock v. AT&T Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012).

Defendants presented Plaintiffs with the pre-drafted Agreement, including the Arbitration Clause, immediately after Plaintiffs auditioned to dance at the club or while Plaintiffs were working, and often undressed, in lingerie, and/or in costume. Ex. 5, ¶6; Ex. 6, ¶¶4-5, 16; Ex. 7, ¶5; Ex. 9, ¶8. As explained by one Plaintiff, hired at age eighteen, after her audition, "[w]ithout giving [her] an opportunity to get dressed, [the manager] brought [her] back to the office…and had [her] sign the contract[] while [she] was still in [her] lingerie." Ex. 6, ¶¶3, 5. She described feeling "uncomfortable" because she was "sitting there, basically naked" and "everything [was] happening very quickly." *Id.* Managers similarly testified that dancers signed contracts after they auditioned, often when they were still wearing their costume. Tyler Dep. 46:18-47:9, Ex. 10; Mondale Dep. 85:5-86:7, Ex. 11; Ex. 4, 60:20-61:15.

Plaintiffs often had consumed at least a few drinks before signing the contract; one Plaintiff testified she was "heavily intoxicated." Bujok Dep. 33:17-34:2, 39:12-19, 56:1-12, Ex. 12; *see also* Ex. 5, ¶4; Mantooth Dep. 35:9-36:13, Ex. 13; Ex. 6, ¶16; Ex. 7, ¶¶4, 14; Ex. 8, ¶10. Indeed, some testified that drinks were pushed on them or managers bought them drinks before

---

[4] All dancers were forced to sign Agreements under similar conditions. *Bujok Decl.*, ¶ 13, Ex. 5; *Darr Decl.*, ¶ 20, Ex. 6; *Mantooth Decl.*, ¶ 14, Ex. 7; *Nagle Decl.*, ¶ 12, Ex. 8; *Raffaele Decl.*, ¶¶ 10-11, Ex. 9.

their auditions. Ex. 13, 33:23-34:7; Ex. 12, 56:1-1. Managers similarly testified that dancers "absolutely" drink at work, and they "assumed" they drank before auditions (and therefore before contracting). Ex. 11, 24:10-25, 86:25-87:13; *see also* Matthews Dep. 63:15-20, Ex. 14; Ex. 2, 138:7-20; Ex. 3, 67:23-68:7; Ex. 4, 41:10-13, 43:6-44:8. Plaintiffs also contracted after using marijuana, to the point where one Plaintiff testified her ability to understand and comprehend the Agreements was impacted. Raffaele Dep. 75:21-77:6, Ex. 15. Managers likely knew she was impaired, but allowed her to contract regardless. *Id.* at 89:18-92:9. Indeed, managers testified they knew dancers used drugs while working. Ex. 11, 104:7-105:17; Ex. 4, 44:9-13. Yet many of the managers had never told a dancer she could not contract because she was too drunk or high or observed or heard about another manager doing so. Ex. 10, 43:19-22; Ex. 3, 46:12-19; Ex 4, 70:10-25. And, despite the prevalence of alcohol and drugs in the workplace, managers either received no training on ensuring dancers were not too intoxicated or otherwise impaired to sign a contract, Ex. 3, 45:7-10; Ex. 4, 71:1-8, or the training was limited to statements such as "[j]ust make sure that they're not too messed up to sign [the] contract, make sure they're coherent enough to be cool with signing that." Ex. 10, 42:18-25; *see also* Ex. 14, 61:23-62:7 (testifying that the training she provided managers on the subject was limited to telling them "[d]on't contract somebody that's drinking" — a claim that was contradicted by the other managers and dancers— but she did not know when she provided such training). Defendants thus created or knew about the existence of circumstances under which Plaintiffs were particularly susceptible to exploitation, and many even lacked the legal capacity to contract.

Defendants presented the Agreement as "take it or leave it"; Plaintiffs had no opportunity to negotiate any terms and had to sign the Agreement as written if they wanted to work. Defts. Disc. Resp., Interrog. 9, Ex. 16; Ex. 5, ¶10; Ex. 6, ¶20; Ex. 7, ¶12, Ex. 8, ¶9; Ex. 9, ¶10; Ex. 10, 50:1-

4; Ex. 3, 62:7-8; Ex. 4, 78:4-7. As one manager put it, if a dancer told her she did not want to sign the arbitration clause, she would probably have said, "[w]ell, then, I guess you don't want to work for us…[I]f you don't want to sign an arbitration [clause], then you will not work for Shotgun Willie's in any way, shape or form." Ex. 2, 155:2-21. Managers rushed Plaintiffs to sign the Agreement, often suggesting they did not need to read it by telling them something like "because [they] had danced before, [they] knew how the industry worked." Ex. 5, ¶¶3, 7-8; *see also* Ex. 12, 52:10-11, 60:17-20, 72:22-73:1; Ex. 6, ¶¶8, 10, 18; Ex. 8, ¶4; Ex. 9, ¶8; Ex. 15, 53:3-18. As one Plaintiff explained, because the manager was in a hurry to get back to the floor, he repeatedly made comments such as "[i]t's just basic stuff," and "[y]ou already know all of this." Ex. 7, ¶6; *see also* Ex. 13, 36:14-25. Plaintiffs also believed that they had to sign the Agreement at the club with a manager watching, so they could not bring it home to study nor have it reviewed by a lawyer. Ex. 8, ¶¶5, 9. Plaintiffs were also prevented from having time to review the Agreement was that they needed to start working immediately so that they could make money, a circumstance of which mangers were well aware. Ex. 13, 43:23-46:11; Ex. 10, 70:12-23; Ex. 3, 13:8-11. As one of Defendants' witnesses stated, "I was there to dance and so taking a lot of time to read [the Agreement] would have reduced my chance to make money." [Doc. 56], Ex. E, ¶9.

Managers did not provide Plaintiffs with a meaningful opportunity to ask questions about the Agreement. Ex. 5, ¶7; Ex. 7, ¶10; Ex. 9, ¶8. Plaintiffs were made to feel that they would not be hired if they asked too many questions, and their circumstances were such that they needed the job. Ex. 8, ¶4. Even if Plaintiffs could have asked questions, the managers could not have answered any questions about the Arbitration Clause because they did not understand it themselves and had never been trained on it. Ex. 10, 34:13-35:15, 36:24-37:7, 40:12-19; 65:1-68:12; Ex. 11, 41:7-46:3, 61:11-63:17, 65:9-17; Ex. 3, 23:2-24, 52:12-54:9; 65:5-20; Ex. 4, 17:6-

20, 23:5-7, 25:22-27:5, 80:15-82:2, 85:10-90:3; Ex. 2, 145:2-6, 149:22-150:7, 163:18-165:25; Ex. 14, 36:6-37:12. As one manager testified, "I don't see how I would be able to figure that stuff out without some sort of lawyer present or law school training background." Ex. 3, 17:15-23. Even the manager of whom the other managers would ask questions about the Agreement and who claimed that she understood the Agreement—it was "pretty straightforward and self-evident"— was unable to accurately explain the meaning and implications of many of the provisions. Ex. 2, 81:2-83:1, 85:1-8, 88:18-90:6, 95:3-18; 99:12-100:22; 104:6-105:16, 109:6-10, 113:16-117:3. Consequently, despite dancers being told that a manager would go over the Agreement with them and the dancer could ask any questions she might have, *id.* at 123:8-124:4, 127:6-7, Ex. 2, in reality no one could have accurately explained the Arbitration Clause to Plaintiffs.

Nor were Plaintiffs in fact able to understand the Arbitration Clause, as none had experience reading contracts or any knowledge of the legal terms used. Ex. 5, ¶10; Ex. 7, ¶13; Ex. 8, ¶¶7-8; Ex. 15, 71:10-19. Even Defendants' dancer witnesses do not understand the Arbitration Clause, although some apparently believe "[y]ou don't have to understand everything to get what you are doing when you sign the [Agreement]." [Doc. 56], Ex. D, ¶14; *see also* Ex. B, ¶8 ("I wasn't really sure what [the Arbitration Clause] meant."); Ex. E, ¶10 ("I doubt most of the managers really understand [the Agreement] in full either."). Regardless, none of Defendants' witnesses actually remembered the Arbitration Clause from when they supposedly read the Agreement. [Doc. 56], Ex. A, ¶8; Ex. B, ¶8; Ex. C, ¶5; Ex. D, ¶14; Ex. E, ¶9; Ex. F, ¶6. Indeed, a manager who had an arbitration clause in *her* contract with Defendants testified that she did not believe she had one. Ex. 14, 50:5-25. That no one realized they had signed an Arbitration Clause undermines any argument that "the provision was commercially reasonable or should reasonably have been anticipated," a factor that supports unconscionability. *Davis*, 712 P.2d at 991.

Plaintiffs' experiences working at other clubs also show that the Arbitration Clause would not have been within their reasonable expectations, as they did not remember other clubs having any such provision. Ex. 12, 20:20-23:14, 71:24-72:3; Ex. 13, 50:20-25; Ex. 15, 21:16-28:6. "Although [individuals] typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation." Restatement (Second) Contracts § 211 *cmt f.* Managers' failure to highlight or explain the Arbitration Clause also contributed to it being an "unknown term[]." *Id.*; *see also* Ex. 6, ¶¶ 9,19; Ex. 8, ¶ 7; Ex. 9, ¶¶ 4, 8; Ex. 12, 45:23-25; Ex. 13, 29:9-22; Ex. 10, 11:2-16; Ex. 11, 60:4-7; Ex. 14, 59:4-8; Ex. 2, 79:6-10; Ex. 3, 26:11-15, 28:3-16, 38:14-39:15, 53:17-23; Ex. 4, 14:3-23, 23:2-10, 68:13-25.

Unlike the attorney who drafted Defendants' Agreement, Ex. 16, Interrog. 11, many Plaintiffs' highest degree is a high school diploma. Ex. 5, ¶10; Ex. 7, ¶13; Ex. 8, ¶8; Ex. 15, 20:15-21:6. Other individual characteristics of Plaintiffs and Defendants' witnesses would have made it impossible for them to understand the Agreement. Several were teenagers when they began at the club, and/or the day they were hired was the first time they had ever been in a strip club. Ex. 6, ¶¶3-5, 10; [Doc. 56], Ex. A, ¶3; Ex. C, ¶2; Ex. E, ¶4. One suffered from severe anxiety. Ex. 5, ¶ 34. Some were afraid to ask questions or negotiate because they could not afford to lose the job. Ex. 7, ¶12; Ex. 8, ¶¶4, 5, 7. As one manager put it: "A lot of these girls don't know what they're doing….[T]hey have to depend on somebody to protect them." Ex. 2, 141:12-24. Yet, rather than ensure that Plaintiffs knew about and minimally understood what it meant for them to agree to Arbitration Clause, "all the circumstances surrounding the formation of the [Agreements]" show that Defendants gave Plaintiffs "no meaningful choice" but to agree to all terms, including the Arbitration Clause (and the delegation clause within it). *Davis*, 712 P.2d at 991. Another court

has held that dancers who described signing similar agreements under similar circumstances established procedural unconscionability because "they signed their contracts under conditions in which ordinary people similarly situated would detect 'unequal bargaining power,' and would feel that they had no 'real' chance to negotiate, no 'meaningful choice,' but to sign." *Roe v. SFBSC Mgmt., LLC*, 2015 U.S. Dist. LEXIS 26057, at *15-22 (N.D. Cal. Mar. 2, 2015). *See also Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 381-84 (6th Cir. 2005); *Nino v Jewelry Exch., Inc.*, 609 F.3d 191, 201 (3d. Cir. 2010).

For all these reasons, the Arbitration Clause is procedurally unconscionable. The "commercial setting, purpose, and effect" of the Arbitration Clause support this conclusion. *Davis*, 712 P.2d at 991. By using numerous tactics to prevent Plaintiffs from voluntarily and knowingly assenting to the Arbitration Clause (and delegation clause), Defendants intentionally attempted to prevent Plaintiffs from challenging their misclassification, which Defendants knew was illegal. *See Skirchak v. Dynamics Research Corp.*, 432 F.Supp.2d 175, 180 (D. Mass. 2006), *aff'd* 508 F.3d 49 (5th Cir. 2007) ("There is evidence that [defendant-employer] was aware that it was in violation of the wage laws and rushed to implement the [dispute resolution program barring class actions] in an attempt to protect itself from potential liabilities.").

### 2.      The Arbitration Clause is Substantively Unconscionable

Because the Arbitration Clause is "one-sided and oppressive, and its enforcement would undermine rights Congress intended to protect through the enforcement scheme" of the FLSA, this Court, like many others, should conclude that it is substantively unconscionable. *Knutson v. Winco Foods, Inc.*, 2003 U.S. Dist. LEXIS 25241 at *13-15 (D. Or. May 7, 2003); *see also Nino*, 609 F.3d at 203; *Coronado v. D.N.W. Hous., Inc.*, 2015 U.S. Dist. LEXIS 134299, at *26-33 (S.D. Tex. Sep. 30, 2015); *SFBSC*, 2015 U.S. Dist. LEXIS 26057, at *28-29. As in those cases, the Arbitration Clause here "represents added costs to [Plaintiffs] for a forum only [Defendants]

want[]," and Plaintiffs "had no meaningful choice whether to 'agree' to arbitration, if [they were] aware of the [A]rbitration [Clause] at all." *Knutson*, 2003 U.S. Dist. LEXIS 25241, at *14.[5]

First, the Arbitration Clause is "unreasonably favorable" to Defendants, *Davis*, 712 P.2d at 991, because it "improperly limit[s] access to a forum for resolution" of Plaintiffs' FLSA claims by making arbitration cost prohibitive—the Clause requires the parties to split the costs (*see* Ex. A-1, 6, ¶22.A), despite the obvious disparity in resources between a business and the dancers—but denying Plaintiffs access to court. *Hove v. Ferrellgas Inc.*, No. 02-RB-2186 (MJW) (D. Colo. Feb. 20, 2003), Ex. 17, p. 4. "[A]greements which require the arbitration of statutory claims are only enforceable under the FAA so 'long as the prospective litigant effectively may vindicate [her] statutory cause of action in the arbitral forum.'" *Sanchez v. Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1148 (10th Cir. 2014). Arbitration clauses that impose prohibitive arbitration costs on litigants prevent them from effectively vindicating their statutory rights. *Nesbitt v. FCNH, Inc.*, 811 F.3d 371, 377 (10th Cir. 2016); *see also Green tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000). Thus, in *Nesbitt*, 811 F.3d at 377-79, the Tenth Circuit held that the plaintiff was prohibited from effectively vindicating her rights under the FLSA because the arbitration agreement's requirement that the parties to bear their own expenses and split the costs of arbitration rendered it prohibitively expensive for the plaintiff.

The Arbitration Clause's requirement that the arbitrator award costs and fees to the prevailing party (*see* Ex. A-1, 7, ¶22.E) likewise improperly prohibits Plaintiffs from vindicating their statutory rights. Courts have held that arbitration agreements with similar provisions

---

[5] Even if Defendants were to offer to waive the unconscionable terms (which they have not), it would not "change the fact that the arbitration agreement as written is unconscionable," as a contract's fairness must be viewed at the time it was formed. *Plaskett v. Bechtel Int'l, Inc.*, 243 F. Supp. 2d. 334, 344 (D.V.I. 2003). "No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it." *Id.*; *see also Edwards v. Doordash, Inc.*, 2016 U.S. Dist. LEXIS 182321, at *27-28 (S.D. Tex. Dec. 8, 2016).

significantly impaired plaintiffs' ability to vindicate their statutory rights because they "did not

provide [Title VII plaintiffs] with incentives and assurances concerning awards of attorney fees

similar to those provided by Title VII." *Hove*, Ex. 17, at 3-4; *see also Daugherty v. Encana Oil &*

*Gas (USA), Inc.*, 2011 U.S. Dist. LEXIS 76802, at *32-33 (D. Colo. July 15, 2011). Not limiting

the arbitrator's ability to award fees against the plaintiff "creat[es] a significant disincentive to

pursuing Title VII claims in arbitration, as compared to pursuing such claims in court." *Id.* Such

a disincentive creates a chilling effect, "erect[s] impermissible obstacles to the [p]laintiffs'

ability to avail themselves of the rights and protections afforded by the FLSA," and

"substantially thwarts [its] statutory enforcement scheme." *Daugherty*, 2011 U.S. Dist. LEXIS

76802, at *32-33; *see also Hove*, Ex. 17, at 4-5.

Unlike a court filing, "the potential costs of arbitrating the dispute [could] easily reach

thousands, if not tens of thousands, of dollars, far exceeding the costs [Plaintiffs] would incur in

court." *Morrison v. Circuit City Stores*, 317 F.3d 646, 669 (6th Cir. 2003). Considering the fees

charged by arbitrators, such as "in-person hearings, discovery requests, routine motions, or

written decisions," a "plaintiff forced to arbitrate a typical $50,000 employment discrimination

claim will incur costs…that range from three to nearly *fifty* times the basic costs of litigating in a

judicial, rather than arbitral, forum." *Morrison*, 317 F.3d at 669; *see also Shankle*, 163 F.3d at

1234.[6] Assuming arbitration costs will be in the thousands (and Defendants' attorney fees even

greater), Plaintiffs cannot risk arbitration. *See, e.g.*, Ex. 5, ¶35; Ex. 6, ¶69; Ex. 8, ¶33; Ex. 9, ¶51.[7]

---

[6] The mere *possibility* that some potential arbitrator *might* not charge prohibitive costs does not provide effective vindication: "in many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution" and will not bring claims. *Nesbitt*, 811 F.3d at 379. This principle applies to the *possibility* that Plaintiffs might win in arbitration and avoid paying Defendants' attorney fees. "The issue is whether the terms of the arbitration agreement itself would deter...employees from bringing their claims in the arbitral forum." *Morrison*, 317 F.3d at 664-65; *see also* Nesbitt, 811 F.3d at 379.

[7] Courts should consider whether the potential costs deter not just the named plaintiffs but also "a substantial number of similarly situated potential litigants." *Morrison*, 713 F.3d at 663. Because many or all Plaintiffs share the

The qualifications that purport to allow cost splitting and an award of fees to a prevailing defendant only to the extent not precluded by law, Ex. A-1, 7, ¶ 22.E, do not render those provisions enforceable. While the FLSA requires an award of fees to a prevailing *plaintiff*, it does not expressly preclude an award of fees to a prevailing defendant. Moreover, nothing in the FLSA prohibits Plaintiffs from bearing their share of arbitration costs. Reading the FLSA in conjunction with these provisions thus creates considerable ambiguity. Also ambiguous is a provision that the arbitrator "shall be permitted to award, subject only to the restrictions contained in [the Arbitration Clause], any relief available in a court." *Id.* at 6, ¶ 22.A. But a court would not be permitted to award fees to Defendants in a FLSA action (other than arguably for frivolous suits), whereas an arbitrator has authority to do so under the Arbitration Clause. When an arbitration agreement is unclear in this regard, the Tenth Circuit has held that it prohibits effective vindication because it is unlikely a plaintiff would risk incurring costs she cannot afford on the chance the arbitrator might interpret the Arbitration Clause to not allow a prevailing party award to Defendants. *See Nesbitt,* 811 F.3d at 380-81. Accordingly, the Arbitration Clause is substantively unconscionable and unenforceable because it fails to provide an accessible forum in which Plaintiffs can fairly vindicate their FLSA rights. *McMullen*, 355 F.3d at 490; *Shankle*, 163 F.3d at 1234-35; *Daugherty*, 2011 U.S. Dist. LEXIS 76802, at *32-33.

In addition, the Arbitration Clause is substantively unconscionable and prevents Plaintiffs from effectively vindicating their rights because it requires them to "file a written grievance with the club describing the dispute and the condition(s) or event(s) that caused the dispute," and wait

---

same job description and economic background of those who attested to their inability to pay arbitration costs, this Court should conclude that the cost-splitting and prevailing party provisions would deter all Plaintiffs and similarly situated individuals from vindicating their FLSA rights. *See id.*; *Nesbitt*, 811 F.3d at 379 n.2.

twenty days for Defendants to resolve it, before they may bring a claim. Ex. A-1, p. 6, ¶22.B.[8] The mandatory grievance provision is unfair, first, because it shortens the FLSA statute of limitations as Plaintiffs may not bring a claim for least twenty days. *See Pokorny v. Quixtar, Inc.*, 2008 U.S. Dist. LEXIS 28439, at *40 (N.D. Cal. Mar. 31, 2008). Courts have held that provisions shortening the statute of limitations illegally waive plaintiffs' FLSA rights in violation of the principle that "[a]n employment agreement cannot be utilized to deprive employees of their statutory [FLSA] rights." *Boaz v. FedEx Customer Info. Servs.*, 725 F.3d 603, 606-07 (6th Cir. 2013). That such provisions are part of arbitration clauses cannot save their validity: "an employee can waive [her] right to a judicial forum only if the alternative forum allow[s] for the effective vindication of [the employee's] claim"; provisions shortening the statute of limitations "do[] the opposite." *Id.*; *see also Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1247-48 (9th Cir. 1994).

The mandatory grievance provision is substantively unconscionable also because it erects an obstacle for Plaintiffs seeking to bring claims against Defendants, but no reciprocal provision applies to Defendants' bringing claims against Plaintiffs. *E.g.*, *Castaldi v. Signature Retail Servs., Inc.*, 2016 U.S. Dist. LEXIS 1911, at *36 (N.D. Cal. Jan. 7, 2016); *Pokorny*, 2008 U.S. Dist. LEXIS 28439, at *47. "Given the unilateral nature of [the provision], requiring [Plaintiffs] to submit to an employer-controlled dispute resolution mechanism…. suggests that [Defendants] would receive a 'free peek' at [Plaintiffs'] case, thereby obtaining an advantage if and when [Plaintiffs] were to later demand arbitration." *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1282-83 (2004). And, because claiming to be an employee (which would necessarily

---

[8] Because the Arbitration Clause precludes Plaintiffs from filing a lawsuit, the mandatory grievance provision appears to prevent Plaintiffs from any legal recourse unless they have first filed a grievance. Of course, if this provision is interpreted as a condition precedent only to arbitration (and not litigation), because Plaintiffs did not file a grievance, "the [Arbitration Clause] has not been activated and the FAA does not apply." *Kemiron Atl., Inc. v. Aguakem Int'l., Inc.*, 290 F.3d 1287, 1291 (11th Cir. 2002). Under such an interpretation, this Court would have to deny Defendants' Motion to Compel Arbitration because a condition required to invoke the Arbitration Clause has not been met. *See id.* at 1290-91.

be part of any contention that Plaintiffs were entitled to fair pay under the FLSA) is a "material breach" of the Agreement, Ex. A-1, 5, ¶18.D, the mandatory grievance procedure creates a Catch-22 for Plaintiffs: either attempt to procure fair compensation and lose their job, or keep their job but forgo any ability to obtain fair compensation. Even apart from fear of breach, the grievance provision is designed to chill claims because Plaintiffs are unlikely to want to confront Defendants in an inherently coercive context before having access a neutral factfinder.

Lack of mutuality appears elsewhere in the Arbitration Clause as well. As discussed in detail below, Plaintiffs are precluded from bringing a class or collective action against Defendants in any forum. *Id.* at 7, ¶22.C. Defendants, however, are unable to bring a class or collective against Plaintiffs only in arbitration, *see id.* at 22.A; were the mandatory arbitration clause held unenforceable but severed from the class/collective action waiver, Defendants could sue a defendant class of dancers. This one-way class/collective action waiver "holds open the opportunity for consolidated action to [Defendants] alone," *SFBSC,* 2015 U.S. Dist. LEXIS 26057, at *27-28, and "excessively favor [Defendants]" by allowing Defendants "alone access to a significant legal recourse," *Zuver v. Airtouch Communications*, 10 P.3d 753, 767 (Wash. 2004). "Without reasonable justification for [the] lack of mutuality, arbitration appears less as a forum for neutral dispute resolution and more as a means of maximizing employer advantage." *SFBSC,* 2015 U.S. Dist. LEXIS 26057, at *25.

Also showing that the Arbitration Clause also is only a "means of maximizing employer advantage," *id.*, it mandates that "either party may request an arbitrator experienced in the adult entertainment industry." Ex. A-1, 6, ¶22.A. While Plaintiffs are unlikely to need an arbitrator with such experience more than once, Defendants will almost certainly be repeat customers. An arbitrator's "pecuniary interest in retaining [business from Defendants] might foster bias in favor

of [Defendants]," and "any such bias would render the arbitral forum fundamentally unfair." *McMullen v. Meijer, Inc.*, 355 F.3d 485, 493 (6th Cir. 2004). Moreover, while "a principal attraction of arbitration is the expertise of those who decide the controversy, that [e]xpertise in an industry is accompanied by exposure…to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw." *Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 732 F. Supp. 2d 293, 303 (S.D.N.Y. 2010). Here, when it is difficult to perceive what sort of valuable "expertise" an arbitrator experienced in the adult entertainment industry would have that an arbitrator without such experience would not, and it appears likely that anyone with experience in the industry would have an interest in maintaining the status quo at strip clubs (misclassification of dancers as ICs), it seems like the only purpose in including this provision was to provide Defendants with yet another edge.[9]

### C. THE ARBITRATION CLAUSE'S UNCONSCIONABLE PROVISIONS ARE NOT SEVERABLE[10]

Although the Agreement contains a severability clause, Ex. A-1, 7, ¶20, "[t]he FAA requires that [this Court] turn to state law to determine whether [it] may be used to remove the offending terms." *Andersen v. Intepros Fed., Inc.*, 240 F. Supp. 3d 143, 162 (D.D.C. 2017). Because Colorado contract law provides that a "court should interpret a contract in its entirety," *Copper Mt., Inc. v. Indus. Sys.*, 208 P.3d 692, 697 (Colo. 2009), this Court must examine entire Agreement, including the unconscionable provisions, in determining whether to enforce the severability clause. Because such an examination will show that the unconscionable provisions

---

[9] Defendants have also demonstrated their willingness to use their power to improperly exert influence over the outcome of the case. *See* [Doc. 47] (explaining Defendants' use of a newspaper they own and/or over which they exert influence to discourage potential plaintiffs from joining the case and drive a wedge between Plaintiffs and their counsel). Moreover, if this Court were to enforce both this provision and the class/collective action waiver (thus requiring multiple arbitrations of these claims), it is unlikely the parties could find enough arbitrators with experience in the adult entertainment industry who did not have improper relationships with Defendants.

[10] Contemporaneously with the filing of this Response, Plaintiffs are filing a Motion to Certify this issue to the Colorado Supreme Court (incorporated herein by reference).

are part of an integrated scheme to chill Plaintiffs from exercising their legal rights, they taint the entire Clause, if not the entire Agreement. *See Summers v. Crestview Apts.*, 236 P.3d 586, 592-93 (Mont. 2010). By "attempt[ing] to use [the Arbitration Clause] to achieve [their] unlawful ends," Defendants "blatant[ly] misused...the arbitration procedure." *Graham Oil*, 43 F.3d at 1249.

The unconscionable provisions of the Arbitration Clause are key parts of a contract whose purpose is to illegally misclassify Plaintiffs and discourage them from exercising their lawful rights to challenge that misclassification. While Defendants purport to give Plaintiffs a "choice" whether to work as ICs or employees, Defendants devote nearly half the contract to spelling out the draconian consequences of a Plaintiff claiming or choosing to be an employee. *See* Ex. A-1, 12-14; *see also* "Business Status Selection by Entertainer," Ex. 18. For instance, Defendants warn that "[i]f [Plaintiffs] make a substantial amount in tips, this could … result in [their] receiving a **'zero' pay check**." Ex. 18 at 2 (emphasis added). And, "[i]f any court, tribunal, arbitrator, or governmental determines, or if [Plaintiff] at any time claims, that the relationship between the parties is one of employment," **the Plaintiff would be required to pay Defendants *all* the "Entertainment Fees" clients had paid her at "any time," and to "immediately remit" to Defendants "25% of all tips that she earned" at any time**. Ex. A-1 at ¶ 13.D. (Of course, this would simply be a windfall to Defendants, who already reaped the benefit of free labor.) Defendants further threaten that they would take all Entertainment Fees not returned by Plaintiff out of any wages paid her and then "immediately submit to the IRS...all necessary filings regarding such income" (a thinly veiled threat to report Plaintiff to the IRS for challenging her IC status). *Id.* at ¶ 13.C.

The Agreement further threatens that the Plaintiff would "materially breach" it by "claiming the business relationship with [Defendants] as being other than that of a landlord and

tenant." *Id.* at 5, ¶18.D. Thus, if a Plaintiff wanted to keep working for Defendants—and the

financial circumstances of many Plaintiffs meant that they needed to—under the express terms of

the Agreement, she could *not* challenge her illegal classification as an IC, whether by a lawsuit

under the FLSA or any other mechanism.[11] The circumstances surrounding Plaintiffs' signing the

Agreements also demonstrate that Defendants did not provide Plaintiffs with any meaningful

choice but to be classified as an IC. Ex. 5, ¶8; Ex. 6, ¶¶12, 17; Ex. 7, ¶7; Ex. 8, ¶¶4-6; Ex. 9, ¶8; Ex.

12, 48:14-20, 51:16-52:11; Ex. 13, 36:14-37:8; Ex. 15, 53:3-9. Indeed, at least one manager

admitted he only told Plaintiffs what it would entail to be an employee, and did not tell them

anything about being an independent contractor. Ex. 4, 21:5-23:1. Plaintiffs felt he "pushed for

[them] to be an 'independent contractor'" by telling them that "girls never choose to be

employees, because you don't make any money as an employee" and "the club would take

almost all [their] money if [they] were to be an 'employee.'" Ex. 5, ¶8. Unsurprisingly, no

dancers "chose" to be classified as employees. *Id.* at ¶14; Ex. 6, ¶23; Ex. 7, ¶15; Ex. 8, ¶13; Ex. 9,

¶12; Ex. 10, 39:19-22; Ex. 11, 74:18-75:25; Ex. 14, 20:20-22; Ex. 2, 27:19-28:3; Ex. 4, 18:6-12.

All these tactics confirm that Defendants included the unconscionable provisions in the

Arbitration Clause as part of a purposeful scheme to chill Plaintiffs from exercising FLSA legal

rights. Yet such a scheme violates public policy and constitutes fraud. First, making it a breach

of their Agreement for Plaintiffs to bring an FLSA or state wage law suit violates the public

policy of Colorado, as the Colorado Constitution "ensures the availability of a judicial forum to

effectuate a right if that right has accrued under the law." *Huizar v. Allstate Inc. Co.*, 952 P.2d

342, 346 (Colo. 1998); *see also Hewitt v. Rice*, 154 P.3d 408, 416 (Colo. 2007). Second,

---

[11] In addition to demonstrating Defendants' intent to dissuade Plaintiffs from challenging their classifications, the breach provision is illegal; an employer may not retaliate against an employee for filing a suit under the FLSA. 29 U.S.C. § 215(3); *see also Hamby v. Associated Ctrs. for Therapy*, 230 F. App'x 772, 785 (10th Cir. 2007).

Defendants' knowing misclassification of Plaintiffs constitutes fraud because Defendants knew the FLSA prohibited them from classifying Plaintiffs as ICs, *see supra* note 2, but concealed this fact from Plaintiffs with the intent that Plaintiffs agree to the illegal classification. *See Trimble v. City and Cty. of Denver*, 697 P.2d 716, 724 (Colo. 1985), *superseded on other grounds* (definition of fraud). Thus, the Agreement and Arbitration Clause, and the circumstances surrounding their executions, are permeated by illegal, unconscionable, and fraudulent provisions, and this Court should not sever the offending provisions: "[A] court will not aid a party who has taken advantage of his dominant bargaining power to extract from the other party a promise that...offend[s] public policy by redrafting the agreement so as to make a part of the promise enforceable." Restatement (Second) of Contracts § 184 *cmt. b.*

Other courts have refused to sever such unconscionable provisions when they "demonstrate[] a systematic effort to impose arbitration on an employee, not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage," or constitute "a deliberate attempt by the employer to impose an arbitration scheme designed to discourage an employee's resort to arbitration." *Nino*, 609 F.3d at 206-07; *see also Hall v. Treasure Bay V.I. Corp.*, 371 F. App'x 311, 314 (3d Cir. 2010); *accord SFBSC*, 2015 U.S. Dist. LEXIS 26057, at *31; *Plasskett v. Bechtel Int'l, Inc.*, 243 F. Supp. 2d 334, 345 (D.V.I. 2003).[12]

---

[12]*Hove, supra*, Ex. 17, p. 5, likewise refused to apply severance because "[t]he savings clause does not permit the court to re-write the attorney fees rules of the arbitration agreement to provide the assurance and incentive provided by Title VII." While this Court severed fee splitting and prevailing party provisions from the rest of the arbitration agreement in *Pollard v. ETS PC, Inc.*, 186 F. Supp. 3d 1166, 1178 (D. Colo. 2016), it did so in reliance on *Daugherty v. Encana Oil & Gas (USA), Inc.*, 2011 U.S. Dist. LEXIS 76802, at *34-36 (D. Colo. July 15, 2011). Plaintiffs respectfully submit that *Daugherty* was wrongly decided because "[s]everability is decided as a matter of state law," and a court "should deny [a] motion to compel arbitration…where the invalid terms of the arbitration clause render the entire clause void as a matter of state law." *Terminix Int'l Co. P'Ship v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005); *see also Anders v. Hometown Mortg. Servs.*, 346 F.3d 1024, 1032 (11th Cir. 2003); *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 219 (3d. Cir. 2003). *Daugherty*, however, incorrectly applied a presumption in favor of arbitration that is erroneously derived from federal law. 2011 U.S. Dist. LEXIS 76802, at *35-36. In doing so, *Daugherty* failed to recognize that any presumption in favor of arbitrability does not apply to a determination whether the parties have an enforceable arbitration agreement, *see Riley Mfg.*, 157 F.3d at 779, and severability, like

Similarly, courts in the Tenth Circuit have held that even when state law favors severing

offending provisions rather than voiding the entire contract, "an overeagerness to sever offending

provisions will encourage parties with superior bargaining power to load their arbitration

agreements with questionable, or even clearly unlawful provisions." *Clary v. Stanley Works*,

2003 U.S. Dist. LEXIS 12747, at *17 (D. Kan. July 24, 2003). Thus, if a contract contains at least

"one arbitration provision that clearly violates" established Tenth Circuit law, such as case law

prohibiting "requiring employees to pay either unreasonable costs or any arbitrators' fees or

expenses as a condition of access to the arbitration forum," the court has refused to sever the

offending term, concluding that "[i]n order to promote fundamental fairness in the arbitral arena,

courts must require parties to reach an arbitration agreement that is enforceable as written." *Id.* at

*17, 19. Otherwise, "[a]rbiration clauses may effectively become in terrorem devices, whose

purpose is to frighten away potential litigants," yet "for those brave souls who are willing to

challenge the unlawful provisions, the courts will simply whittle down the arbitration clause until

it is within the outer limits of enforceability." *Id.* at *18-19. "Such a system flies in the face of the

Supreme Court's conclusion that arbitration furthers broader social purposes by providing an

alternative forum where a prospective litigant may effectively vindicate his rights." *Id.* at *19.

Defendants have done exactly what these courts have feared by including unconscionable cost-

sharing, fee-shifting, and mandatory grievance provisions as part of an integrated scheme to

misclassify Plaintiffs and chill them from exercising their legal rights. *See Summers*, 236 P.3d at

592-93. Because the Arbitration Clause is plainly part of Defendants' scheme to violate wage

laws and discourage Plaintiffs from enforcing their rights, this Court must decline to enforce the

---

"'generally applicable contract defenses,'" is an issue of state law "'[that] may be applied to invalidate arbitration agreements without contravening' federal law." *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1109 (9th Cir. 2003); *see also* Margaret M. Harding, *The Redefinition of Arbitration by Those with Superior Bargaining Power*, 1999 Utah L. Rev. 857, 945-46 (1999).

entire Arbitration Clause, and maybe the entire Agreement. *See Nino*, 609 F.3d at 207.

## IV. THE CLASS AND COLLECTIVE ACTION WAIVER IS UNENFORCEABLE

The Agreement's class/collective action waiver (Ex. A-1, 5, ¶¶ 22.A, 22.C.) is also unenforceable because it is illegal under both the National Labor Relations Act ("NLRA") and the FLSA. This Court cannot delegate the legality of the class/collective action wavier to the arbitrator because if it is illegal under federal law to preclude class/collective litigation of FLSA claims, enforcing the Arbitration Clause to any extent, even just to arbitrate the legality of the waiver, requires compelling arbitration on an individual basis, thereby violating federal law. Moreover, as discussed above, Plaintiffs cannot afford to pay an arbitrator to decide this issue.

### A.     The Arbitration Clause is Illegal Under the NLRA

The NLRA provides employees the right to self-organize, collectively bargain, and "engage in *other concerted activities* for the purpose of collective bargaining or other mutual aid or protection," and makes it "an unfair labor practice for an employer...to interfere, restrain, or coerce employees in the exercise of [those] rights". 29 U.S.C. §§ 157, 158(a)(1). "[O]ther concerted activities" have long been held to include "filing a collective or class action suit." *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147, 1152 (7th Cir. 2016), *cert granted*. Courts have also long held that "employer-imposed, individual agreements that purport to restrict [these] rights are unenforceable." *Id.*; *NLRB v. Alt. Entm't, Inc.*, 2017 U.S. App. LEXIS 9272, *14 (6th Cir. 2017). Critically, an employer violates the NLRA "when it requires employees…, as a condition of their employment, to sign an agreement that precludes them from filing joint, class, or collective claims addressing their wages, hours or other working conditions against the employer in any forum, arbitral or judicial," because "such an agreement unlawfully restricts employees' …right to engage in concerted action for mutual aid or protection." *D.R. Horton, Inc. and*

*Michael Cuda*, 357 N.L.R.B. 2277 (Jan. 3, 2012).[13]

Because arbitration agreements with class/collective action waivers that "strip away employees' rights to engage in 'concerted activities'" are unlawful under the NLRA, they are illegal and "meet[] the criteria of the FAA's saving clause for nonenforcement." *Lewis*, 823 F.3d at 1157, 1159; *see also Alt. Entm't*, 2017 U.S. App. LEXIS 9272, at *16. "[T]he arbitration requirement is not the problem....The NLRA obstacle is a ban on initiating, in any forum, concerted legal claims—not a ban on arbitration." *Morris*, 834 F.3d at 984.Because a class/collective action waiver forces an employee to waive her substantive NLRA rights as a condition of employment, the very formation of the contract is illegal, and "[i]llegality is a standard contract defense contemplated by the FAA's saving clause." *Lewis*, 823 F.3d at 1159-60. "If the NLRA does not render an arbitration provision sufficiently illegal to trigger the saving clause, the saving clause does not mean what it says." *Id.*

Because the NLRA guarantees that "[i]rrespective of the forum in which disputes are resolved, employees must be able to act in th[at] forum together," *Morris*, 834 F.3d at 989, the class/collective action waiver is illegal, and the FAA's saving clause prohibits its enforcement.[14]

---

[13] The Supreme Court has granted certiorari in three cases representing a split in authority whether *D.R. Horton* violates the FAA. *See Lewis*, 823 F.3d 1147; *Morris v. Ernst & Young, LLP*, 834 F.3d 975 (9th Cir. 2016); *Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013 (5th Cir. 2015), *cert. granted* 137 S. Ct. 809. In both *Lewis* and *Morris*, the courts agreed with the NLRB that an arbitration agreement requiring an employee to waive her right to bring \class or collective actions against her employer as a condition of employment is unenforceable because it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of the rights guaranteed in [the NLRA]." *Lewis*, 823 F.3d at 1155); *see also Morris*, 834 F.3d at 981-83. The Sixth Circuit, too, has held that "an arbitration provision that attempts to eliminate employees' right[s] to engage in concerted legal activity is unenforceable." *Alt. Entm't*, 2017 U.S. App. LEXIS 9272, *18.

[14] Although this Court ruled in *Pollard* that a mandatory class/collective action waiver in an employment contract did not violate the NRLA, this Court did not have the benefit of the subsequent decisions in *Lewis*, *Morris*, and *Alternative Entertainment*, and relied on Supreme Court cases—*Concepcion*, *Italian Colors*, and *Gilmer*—that do not address the FLSA or substantive rights granted to employees under the NLRA. *Pollard*, 186 F. Supp. 3d at 1184. *Concepcion* is distinguishable because it addressed a court rule regarding collective action waivers in consumer contracts, rather than a statutory right "allow[ing] workers to act in concert." *Alt. Entm't,* 2017 U.S. App. LEXIS 9279, at *23-25. And unlike *Italian Colors* and *Gilmer*, in which the Supreme Court held the plaintiffs were not forgoing substantive statutory rights by being forced to arbitrate their disputes, mandatory waivers of class/collective actions in employment contracts "prohibit[]...employees from exercising the substantive statutory right to concerted

## B.    The FLSA Bars Enforcement of the Class/Collective Action Waivers

Assuming *arguendo* that the Agreements' class/collective action waivers are not prohibited by the NLRA, the waivers are invalid under the FLSA itself. An action under the FLSA "may be maintained against any employer...by any one or more employees in behalf of himself or themselves and other employees similarly situated." 29 § U.S.C. 216(b). There is an inherent conflict between class/collective action waivers and the FLSA's purpose "of protecting the class of employees that possesses the least bargaining power in the workforce: 'the unprotected, unorganized and lowest paid of the nation's working population.'" *Skirchak*, 423 F. Supp. 2d at 178-81. Allowing employers to force workers to waive their rights to bring collective actions under the FLSA makes bringing an FLSA claim an impossible hurdle for an employee who cannot afford to bring a claim on an individual basis, contravening Congress' purpose in enacting the FLSA to protect "this nation from the evils and dangers resulting from wages too low to buy the bare necessities of life." *United States v. Rosenwasser*, 323 U.S. 360, 361 (1945); *see also Gaffers v. Kelly Servs.*, 203 F. Supp. 3d 829, 838-39 (E.D. Mich. 2016).

## V.    CONCLUSION

For the reasons above, Defendants' Motion to Dismiss should be denied. Alternatively, Plaintiffs are entitled to a jury trial on the Arbitration Clause.[15]

Respectfully submitted this 27th day of November 2017.

---

action guaranteed by the NLRA." *Id.* at *27-29 (citing *Italian Colors*, 133 S. Ct. at 2309, and *Gilmer*, 500 U.S. at 27). But regardless whether the right to concerted legal action is procedural or substantive, the NLRA "makes it illegal to force workers, as a condition of employment, to give up the right to concerted legal action"; "[a]n employer cannot avoid this core tenet of federal labor law simply by nesting a waiver of the right to collective legal action in an arbitration provision." *Id.* at *30. Lastly, because the FAA's saving clause is triggered by such illegal contract provisions that "strip away employees' rights to engage in concerted activities," *Lewis*, 823 F.3d at 1157, the FAA does not irreconcilably conflict with the NLRA. Plaintiffs therefore respectfully request this Court to reconsider its position on this issue.

[15] Plaintiffs have at least shown "a genuine dispute of material fact as to the making of the agreement," and this Court is required under FAA § 4 to hold a jury trial on the making of the Arbitration Clause before issuing a stay. *Id.*, *4-5; *see also Howard*, 748 F.3d at 978; *Int'l Asset Mgmt. v. Holt*, 487 F. Supp. 2d 1274, 1287-88 (N.D. Okla. 2007). Indeed, Defendants' statement that Plaintiffs' claims regarding the signing of their Agreements are in stark contrast to experiences of other entertainers, [Doc. 57], 13 n.9, shows that there are disputed issues of material fact.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*
Mari Newman
Darold W. Killmer
Andy McNulty
Liana Orshan
1543 Champa St., Ste. 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
mnewman@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com
lorshan@kln-law.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2017, I filed the foregoing via CM/ECF, and the CM/ECF system will send notification to the following:

Jeffrey A. Springer
Matthew R. Giacomini
Jason C. Astle
Michael Zwiebel
Springer & Steinberg, P.C.
1600 Broadway, Suite 1200
Denver, CO 80202
(303) 861-2800
(303) 832-7116 fax
jspringer@springersteinberg.com
mgiacomini@springersteinberg.com
jastle@springersteinberg.com
mzwiebel@springersteinberg.com

*Counsel for Defendants*

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*

Jesse Askeland